**In the Matter of James P. QUINN.**

**No. 49S00–9902–DI–129.**

Supreme Court of Indiana.

Nov. 27, 2000.

Bruce A. Kotzan, Indianapolis, IN, for the Respondent.

Donald R. Lundberg, Executive Secretary, D.J. Mote, Staff Attorney, Indianapolis, IN, for the Indiana Supreme Court Disciplinary Commission.

## DISCIPLINARY ACTION

*Per Curiam*

Today we find that the respondent, James P. Quinn, should be suspended from the practice of law for commingling his personal funds with those of his clients and allowing the balance in his client trust account to fall below an amount sufficient to satisfy outstanding obligations of his clients.

■ This attorney disciplinary matter has come before this Court for final resolution upon the hearing officer's findings of fact and conclusions of law. The hearing officer concluded that the respondent engaged in misconduct as charged. The respondent, pursuant to Ind. Admission and Discipline Rule 23(15), has petitioned this Court for review of the hearing officer's findings and conclusions. Where the hearing officer's report is challenged, our review of the case is *de novo* in nature, and involves a review of the entire record presented. *Matter of McCord,* 722 N.E.2d 820 (Ind.2000).

Within the review framework described above, we now find that the respondent collected a $25,000 settlement on behalf of a client. Pursuant to a written contingency fee agreement with his client, the respondent was entitled to a $10,000 fee. The final settlement statement reflected that another $12,371 was to go to pay medical providers, $20 was to go to the respondent for expenses, and the remaining $2,609 to the client. On October 25, 1996, the respondent deposited the $25,000 check into his client trust account, then issued to his client a check drawn on the account for $2,609. Thereafter, the respondent failed to issue a check payable to himself for his fee.

Between October 1996 and March 1997, the respondent wrote several checks on the account for personal and business obligations unrelated to the client's case, including a check for $1,915.69 to American Express and a check for $14,100 to a local automobile dealership. By February 24, 1997, the balance had fallen below $12,371—the amount needed to satisfy obligations to the client's medical creditors. By March 24, 1997, it had fallen to $265.79.

By August 1997, the client, receiving inquiries from his medical providers about the unpaid medical bills, attempted unsuccessfully to contact the respondent to learn the status of the situation. When he did finally speak to the respondent, the respondent failed to provide meaningful information.

During this time, the respondent maintained a second trust account at another bank. At hearing of this disciplinary complaint, the respondent testified that he had sufficient funds in that account to cover the obligations attendant to his client whenever the first trust account contained insufficient funds. However, hearing officer concluded and we so find that the respondent failed to present any evidence that the funds held in the second account were in any way connected with his client's settlement and, therefore, that any funds contained in the second account on or before March 24, 1997, could not be considered when examining his safekeeping of his client's settlement proceeds. The respondent contends that he ceased using the first account as a trust account in February of 1997, and instead thereafter established the second account as his attorney trust account. The record supports this assertion. However, the record also reveals that the respondent never directly transferred the $12,371 he was holding for the client and the medical providers from the first to the second account. He claimed that he effectively accomplished

this transfer by leaving earned attorney fees in the first account instead of withdrawing them, but never produced an accounting to support that assertion.

It is clear that by June 12, 1997, the respondent had established the second account as his sole attorney trust account. Between June 12 and August 20, 1997, the second account contained less than $12,371 (an amount necessary to satisfy obligations to the client, the client's medical providers, and obligations to certain other clients) on 68 of the 70 days during this period. Additionally, the combined balance of the accounts was insufficient to cover obligations to the clients and the medical providers on 29 of those 70 days. The respondent also drew a check for a personal obligation on the second account during this period.

On October 27, 1997, the respondent provided a response to the client's grievance to the Disciplinary Commission, stating therein that, "[t]here is *still held* in escrow the amount of $9,836 that was withheld for the [medical providers], according to their bills ..." (Emphasis supplied). The respondent paid outstanding bills of the medical providers on September 9 and November 21, 1997.

In his petition for review of the hearing office's report, the respondent asserts that he believed that as long as he retained money in his trust accounts sufficient to pay 'client and third party obligations, he was permitted to use his portion of the recovery in the trust accounts directly to meet personal and business obligations. The respondent contends that he maintained a general idea of what money out of the trust accounts was owed, but did not keep a specific or daily record, and that he always believed he had sufficient funds to cover client and third party obligations. In early 1997, the respondent learned of this Court's standards for trust account management and at that time progressively and gradually used the second account

as a client trust depository and began using the first account as an operating account. The respondent asserts: "Gradually, by not withdrawing his fee portion from recovery amounts deposited in [the first account], and employing the money in the [first account] for personal and business expenses, the Respondent, in effect, transferred obligated trust funds from the [first account] to the [second account]." Although the respondent's statements may explain why his unauthorized use of client funds occurred, they do nothing to dissuade us from finding that the violations took place. The fact remains that while the first account was the respondent's client trust account, the balance in that account, during relevant times, was consistently below an amount necessary to satisfy the obligations of his client's third party medical providers. After the second account became his sole trust account, on numerous occasions it also contained insufficient funds to satisfy those obligations, and, in fact, the accounts' combined balances on several occasions contained insufficient funds. Checks for the respondent's personal obligations were drawn on each account during the times the respondent claimed each was his sole trust account. The fact that, in the end, no client or third party was permanently deprived of funds is good fortune, but not controlling as to whether the respondent engaged in misconduct.

■ In Indiana, conversion consists of the knowing or intentional exertion of unauthorized control over the property of another. IC 35–43–4–3.[1] The respondent's bank statements reflecting account balances for the end of June 1997 showed that each account's balance (as well as the accounts' combined balances) was insufficient to cover obligations to clients and third parties. The respondent testified that he audited the sufficiency of his bank accounts by examining the monthly ac-

---

**1.** It is useful here to note that Indiana criminal law defines theft as knowing and intentionally exert[ing] unauthorized control over the property of another person, with the intent to deprive the other person of its value or use. *See* IC 35–43–4–2.

count statements. Accordingly, we find that he knowingly exerted unauthorized control over client and third party funds held in trust by knowingly allowing the account balances to fall below an amount sufficient to satisfy their obligations (in part by drawing checks on the trust accounts for personal expenditures), and that by so doing he violated Ind. Professional Conduct Rule 8.4(b) by committing a criminal act, conversion, which reflects adversely on his fitness as an attorney.

■ Indiana Professional Conduct Rule 1.15(a) requires lawyers to keep the property of clients and third parties held in trust separate from their own. The respondent failed promptly to withdraw his $10,000 fee from the first account, then drew checks for various personal obligations on the account. A lawyer may deposit his or her own funds into a client trust account only in an amount reasonably sufficient to maintain a nominal balance. *See* Prof.Cond.R. 1.15(a). The respondent permitted his $10,000 fee to remain in the account, and by so doing, he violated Prof. Cond.R. 1.15(a).

■ Professional Conduct Rule 1.4(a) provides that a lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information. The hearing officer found that the respondent violated this rule by failing to provide the client with information regarding payment to third party medical providers. Specifically, the hearing officer found that the respondent failed to respond to his client's telephone calls after medical providers began contacting the client about unpaid bills.

The respondent argues that the fact that he failed to return phone calls does not by itself establish a violation of Prof.Cond.R. 1.4(a). Instead, he argues that it must be demonstrated that the client's inability to contact him divested the client of the ability intelligently to participate in the case, citing the comment to Prof.Cond.R. 1.4:

The client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so . . .
The guiding principal is that the lawyer should fulfill reasonable expectations for information consistent with the duty to act in the client's best interests, and the client's overall requirements as to the character of the representation.

The respondent asserts that the Commission failed to demonstrate that the client had insufficient information to make decisions concerning his case.

The record indicates, however, that medical creditors began contacting the client about unpaid medical bills prior to August 1997. At about that time, the client began trying to contact the respondent for an explanation. The respondent states that, given the chance that the client's insurer might also provide partial settlement, he wanted to "preserve the level of specials" by delaying payment until any such settlement materialized. However, had this tactic been shared with the client, the client may have not been concerned by the creditor contacts. In the absence of a full explanation, the client attempted repeatedly to contact the respondent about the unpaid medical bills, but never received a satisfactory answer.[2]

2. Testimony at hearing illustrates this fact:

Commission: At some point you tried to contact your attorney about these billings. Why is that?
Client: The billings had not been paid. The main reason for my contacting Mr. Quinn was to find out why.
    . . .

Commission: Describe for the hearing officer what efforts you made to get in touch with Mr. Quinn.
Client: A number of phone call to his office. Basically just negative results
    . . .
Commission: How many times, approximately, would you say you phoned his office?
Client: At least once a week.

Accordingly, we find that the respondent violated Prof.Cond.R. 1.4(a).

■ A lawyer violates Prof.Cond.R. 8.1(a) by knowingly making a false statement of material fact in connection with a disciplinary matter.· The balances in the respondent's trust accounts dropped below $9,836 (an amount necessary to satisfy the outstanding obligations owed to the client's medical creditors) on numerous days between June 13 and August 20, 1997. However, in his written response he provided to the Commission regarding the grievance, the respondent stated that there was "still held" in escrow an amount sufficient to satisfy those obligations. The import of that statement was that the funds held in trust for the creditors had, since the settlement was deposited in October 1996, remained in the account. The respondent made the statement knowing it was false, since his monthly examination of his account statements would have put him on notice of the consistent deficiencies. Accordingly, we find that he violated Prof. Cond.R. 8.1(a). In that his conduct involved dishonesty, fraud, deceit, and misrepresentation, we find also that it violated Prof.Cond.R. 8.4(c).

■ Having found misconduct, we must now assess an appropriate discipline for it. Among the factors we examine in this analysis are aggravating and mitigating factors. In aggravation, we note that the respondent has twice before been the subject of a disciplinary inquiry by this Court. In 1985, he received a private reprimand. In 1998, he was suspended for 90 days after being criminally convicted of operating a motor vehicle while intoxicated, gambling, public intoxication, and client neglect. *Matter of Quinn*, 696 N.E.2d 863 (Ind.1998). In mitigation, we note the respondent's extensive arguments to the effect that any trust account shortcomings were the result of poor business practices and bookkeeping rather than any intent permanently to deprive clients or third

parties of their rightful property. In determining the proper discipline where a lawyer mishandles client funds, we examine the circumstances underlying the events:

It is true that outright theft of client funds generally warrants severe sanction, up to and including disbarment. *See, e.g, Matter of Good*, 632 N.E.2d 719 (Ind.1994); *Matter of Shumate*, 647 N.E.2d 321 (Ind.1995). Those cases demonstrate that where a lawyer knowingly or intentionally steals client or third party funds held in trust for the lawyer's own selfish benefit, that lawyer is viewed as being unfit to continue in the profession absent extremely compelling mitigating or extenuating factors. Here, respondent ... clearly engaged in serious client and third-party fund mismanagement. However, we are convinced that the respondent's mission was not theft of client money. As the respondent explained it, from his "pooled" trust account he unwittingly permitted one client's funds to be used for other, unrelated obligations of other clients and/or third parties in an apparent good faith belief that other client funds would soon arrive to cover the expenditures. We, of course, are not persuaded that the respondent's actions were totally inadvertent or unwitting; however, we are convinced that he did not intend to deprive his ... client of the value or use of his funds sufficient to find theft of the funds ... [T]he respondent's acts indicate no selfish motive in his inappropriate use of his client's funds. As such, we view his acts as somewhat less culpable than outright theft. However, even in the absence of a finding that the respondent stole his client's money, his gross mishandling of funds held in trust for others nonetheless indicates serious professional shortcomings deserving of significant sanction, primarily for the protection of other clients.

Commission: How long did this go on?

Client: I would say at least six, seven months.

*Matter of Towell,* 699 N.E.2d 1138, 1142 (Ind.1998). *See also Matter of Kouros,* 735 N.E.2d 202 (Ind.2000) (suspension for not fewer than 12 months for conversion of client funds in trust account, citing *Towell* ). We find that the analysis in *Towell* is appropriate for the trust fund misconduct at issue in this case. The respondent's misconduct was serious and breached the fundamentals of the lawyer-client fiduciary relationship, but nonetheless represents something less than outright theft. Considering also his purposeful misleading of the Commission and poor communication with his client, we conclude that his actions warrant a significant period of suspension with the requirement that he demonstrate his fitness before again being allowed to represent the interests of others.

It is, therefore, ordered that the respondent, James P. Quinn, be suspended from the practice of law for a period of not fewer than twelve (12) months, beginning January 1, 2001. At the conclusion of that period of suspension, the respondent may petition this Court for reinstatement to the bar of this state under the provisions of Ind. Admission and Discipline Rule 23(4).

The Clerk of this Court is directed to provide notice of this order in accordance with Admis.Disc.R. 23(3)(d) and to provide the clerk of the United States Court of Appeals for the Seventh Circuit, the clerk of each of the Federal District Courts in this state, and the clerk of the United States Bankruptcy Court in this state with the last known address of respondent as reflected in the records of the Clerk.

Costs of this proceeding are assessed against respondent.